United States District Court
Eastern District of Michigan
Southern Division

United States of America, )

        Plaintiff, )

v. )

)Case No. 25-cr-20202

)

)Hon. Robert J. White

Dorian Trevor Sykes, )

        Defendant. )

                         /

## Motion for a Downward Departure

## Re: "Significantly Reduced Mental Capacity"

NOW COMES, Defendant Dorian Trevor Sykes, pro se, hereby respectfully moves this Honorable Court to grant a 4-Level reduction from the applicable sentencing guidelines on the grounds of defendant's "Significantly Reduced Mental Capacity."

### I. History and Facts

On September 30th, 2025, defendant entered a guilty plea on four counts of unarmed bank robbery, in violation of 18 U.S.C. §2113(a). The Presentence Report has determined defendant's guideline imprisonment range is 151 to 188 months.

Defendant acknowledged the seriousness of both his instant offense and his prior criminal history in his Sentencing Memorandum. In doing so, he asked the Court to impose a sentence of 129 months imprisonment, which is the average and median sentence imposed on (100%) of the 226 defendants who also have a Final Offense Level of 29 and a Criminal History Category of VI, after excluding defendant's who received a §5K1.1 substantial assistance departure.

In closing of Defendant's Sentencing Memorandum, he asked the Court to consider any probable downward departure and or variance separately, using the 129 months imprisonment as the starting point, on the basis that if Defendant didn't present any grounds warranting either a departure or variance, his case would then reside within the heartland of typical similarly situated cases, who on average did receive 129 months of imprisonment, pursuant to the Judiciary Sentencing Information (JSIN) database.

## II. Legal Standard

Pursuant to Section 5K2.13 of the United States Sentencing Guidelines, Diminished Capacity (Policy Statement): A sentence below the applicable guideline range may be warranted if the defendant committed the offense while suffering from a significantly

- 1 -

reduced mental capacity... If a departure is warranted, the extent of the departure should reflect the extent to which the redu -ed mental capacity contributed to the commission of the offense

> "Significantly reduced mental capacity" means the defendant, although convicted, has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful."
> U.S.S.G. § 5K2.13, comment. (n.1) (1998).

The Commission described its definition of an SRMC as follows:

> The amendment... defines "significantly reduced mental capacity" in accord with the decision in United States v. McBroom, 124 F. 3d 533 (3rd Cir. 1997). The McBroom court concluded that "significantly reduced mental capacity" included both cognitive impairments (i.e., an inability to understand the wrongfulness of the conduct or to exercise the power of reason) and volititional impairments (i.e., an inability to control behavior that the person knows is wrongful).
> The application note specifically includes both types of impairments in the definition of SRMC. U.S.S.G. App. C §5K2.13, amendment 583 (1998).

"When a defendant seeks to establish facts which would lead to a sentence reduction under the Guidelines, he shoulders the burden of proving those facts by a preponderance of the evidence." United States v. Rodriguez, 896 F. 2d 1031, 1032 (6th Cir. 1990).

## III. Supporting Evidence of Defendant's SRMC

A. Defendant has been evaluated by a private psychologist, Jennifer M. Zoltowski, MS, LLP on Feburary 13th, 2026 at Federal Detention Center - Milan. Defendant has provided the Court here a full copy of Ms. Zoltowski's report, as Exhibit 1, Psychological Evaluation..

On page 9 of Exhibit 1, it states, ".. The DSM-5-TR definition of gambling disorder describes the condi-tion as a persistent and problematic gambling behavior pattern leading to significant distress or impairment. To rece-ive a diagnosis of gambling disorder, an individual must meet at least four of these criteria within a 12-month period:" The DSM-5-TR goes on to list ten separate criteria. According to Ms. Zoltowski, defendant meets all ten of the criteria. (See, pages 9-10 of Exhibit 1).

On page 11 of Ms. Zoltowski's report (Exhibit 1), she states, ".. Mr. Sykes meets the DSM-5-TR definition of gambling disorder, severe.." She then goes on to make several recommendations for the Court to consider.

B. According to the South Oaks Gambling Screen, the defendant is a "probable pathological gambler." (see, page 26, paragraph 96, Presentence Report).

C. In 2019, defendant was arrested at the craps table of Motor City Casino wearing the same clothes he'd worn during two unarmed bank robberies. Defendant had not worn any disguise and went straight to the casino immediately after the crimes. (see, Exhibit 2, FOX 2 News) This is clearly evident that defendant has suffered from significantly reduced mental capacity as a result of his severe gambling disorder.

D. In the present case the FBI sought to arrest the defendant at the MGM Grand Casino, because they knew he had reservations. The government has conceded in open court to [it's] belief defendant in fact has a gambling addiction.

There exists a wealth of evidence to corroborate the facts surrounding defendant's gambling disorder, and that he

-5-

had a significantly reduced mental capacity during the commission of the instant offense(s).

## IV. Law and Analysis

"Significantly reduced mental capacity" means the defendant, although convicted, has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful. U.S.S.G. § 5K2.13, comment. (n.1) (1998). The Commission described its definition of SRMC as follows:

> The amendment... defines SRMC in accord with the decision in United States v. McBroom, 124 F.3d 533 (3d Cir. 1997). The McBroom court concluded that SRMC included both cognitive impairments (i.e., an inability to understand the wrongfulness of the conduct... and volititional impairments (i.e., an inability to control behavior that the person knows is wrongful).

§5K2.13 does not require a direct casual link between the SRMC and the crime charged. See, United States v. Harris, 1994 U.S. Dist. LEXIS 17366, No. SR192 Cr. 455, 1994 WL 683429, at *4-5 (S.D.N.Y. Dec. 6, 1994); see also McBroom, 124 F.3d at 548 n. 14 (an SRMC "must be a

- 6 -

contributing cause of the offense, but need not be the sole cause."); United States v. Cantu, 12 F.3d 1506, 1515 (9th Cir. 1993). See also, United States v. Michael Sadolsky, 234 F.3d 938; 2000 U.S. App. LEXIS 31360; 2000 FED Appx. 0410P (6th Cir. 2000) Case No. 99-5780 (Two-level reduction SRMC, gambling disorder).

In the present case defendant's SRMC was a volitional impairment that was the driving force behind the crimes before the Court. Defendant's volititional impairment (gambling disorder) rendered his inability to control behavior that he otherwise knew was wrongful. This volititional impairment was concluded in the McBroom court.

### V. Downward Variance As Alternative Relief

A district court may properly consider any mitigating factor not proscribed or adequately addressed by the Guidelines. See, Koon, 518 U.S. at 92 ("Congress allows district courts to depart from the applicable Guideline range if the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described") (quoting 18 U.S.C. § 3553(b)); see also, United States v. Coleman, 188 F.3d 354, 359 (6th Cir. 1999).

-7-

"A variance refers to the selection of a sentence outside of the advisory guidelines range based upon the district court's weighing of one or more of the sentencing factors of §3553(a). While the same facts and analysis can, at times, be used to justify both a guidelines departure and a variance, the concepts are distinct. see, United States v. Grams, 566 F.3d 683. 686-87 (6th Cir. 2009).

The basis for sought variance in the present case, is that defendant's "SRMC" as a result of his gambling disorder took the case outside of the "heartland" of typical cases the Commission envisioned when [it] formulated the Guidelines.

An individual assessment under §3553(a) will without contention hold that defendant's "SRMC" and gambling disorder was the driving cause of the crimes before the Court.

WHEREFORE, defendant has established facts by a preponderance of the evidence in support of either a downward departure or downward variance. Defendant asks the Court to Grant him the relief sought, herein, on the basis of "nature and circumstances of offense" and "history and characteristics of defendant", under §3553(a).

Date: March 27th, 2026

Respectfully,

~~Dorian T. Sykes~~
Dorian Trevor Sykes
Defendant.
Pro Se

- 8 -

Exhibit 1

***CONFIDENTIAL***

**Jennifer M. Zoltowski, MS, LLP**
**The Center for Assessment, Inc.**
**26789 Woodward Ave, Suite 110*Huntington Woods, MI 48070**
**(248) 677-0074 * AssessmentCenterMI@gmail.com**

### PSYCHOLOGICAL EVALUATION & CRIMINIOGENIC RISK ASSESSMENT

**SYKES, Dorian**
**Case # 2:25-CR-20202-01**

|  | YEAR | MONTH | DAY |
|---|---|---|---|
| Date Tested | 2026 | 02 | 13 |
| Date of Birth | 1983 | 09 | 10 |
| Age | 42 |  |  |

### PROCEDURES
- Clinical Evaluation
- Records Review
- Minnesota Multiphasic Personality Inventory-2-Restructured Form (MMPI-2-RF)
- Millon Clinical Multiaxial Inventory IV (MCMI-IV)

### DOCUMENTS REVIEWED
| | |
|---|---|
| 2025 | My Biggest Losses (Written by Mr. Sykes) |
| 2026-02-04 | Presentence Investigation Report |

### REASON FOR REFERRAL
Dorian Sykes was referred for evaluation and risk assessment secondary being charged with 2 counts of Credit Union Robbery, one count of Bank Robbery and one count of Attempted Bank Robbery in the United States District Court for the Eastern District of Michigan.

Please note that a risk assessment is designed to determine an individual's risk of offending and/or re-offending and is not to be used as a factor in determining guilt. Typical factors that are explored during a risk assessment include mental status, social history, family functioning, treatment history, academic and intellectual functioning, emotional functioning and substance abuse history. The purpose and potentially non-confidential nature of the assessment was explained to Mr. Sykes and he agreed to participate. This evaluation was completed at the behest of his attorney, Harry Mihas. This writer is not Mr. Sykes's mental health provider nor has a therapeutic relationship been developed. The purpose of this evaluation is to assess the potential risk Mr. Sykes poses to himself, the complainant, and the community at large. The data derived from this evaluation will be used for treatment planning and potentially purposes of court.

The information and recommendations that follow are based on Mr. Sykes's self-report, psychological testing, this writer's years of expertise conducting risk assessments and a

- 2 -

review of the above documentation. The importance of being honest was explained to Mr. Sykes, and he was informed that he could decline to answer any question if he did not wish to respond. If there is information/documentation that was not made available to this writer or that refutes the information provided, recommendations and conclusions may be subject to change.

## INTERVIEW WITH DORIAN SYKES

### Family/Social History
Dorian Sykes is a 42-year-old man presently housed at the Milan Federal Detention Center. He has been incarcerated since Match 18, 2025. He was born in Detroit, Michigan to Leslie Sykes and Ronald Gibson. His parents were never married. They have two children in common, Ronald, age 45, and Mr. Sykes. Mr. Gibson was in prison when Mr. Sykes was born, and the first time that he saw his father was in a prison visitation room at age 4. He believes his father served 6 years for an armed robbery offense in Ohio.

Per Mr. Sykes, after his father was released, he never served more time in jail or prison, although continued to engage in criminal behavior. He states that his father was addicted to heroin throughout his adult life. When his father came home from prison, he was "on the streets" as a "gambler, hustler and scam artist". He states that his father would take him to different "after hours" venues around the city of Detroit, primarily places where gambling occurred. He states that his father occasionally hustled him for money, although he would generally give him some of his money back. His father would also use him as part of the hustle on occasion. Mr. Sykes talked about one scam in particular, in which his father would go to a jeweler and have them stamp gold jewelry with a 14-karat stamp and give him a fake receipt, although it was not actually 14 karat gold. His father would approach people, make up a "sob story" and sell the valueless jewelry for cash.

Per Mr. Sykes, his paternal grandfather actually had two families; five children with Mr. Gibson's mother and an entirely separate family who lived in Ohio. Mr. Sykes indicates that his father was incapable of love, although he did seem to realize they were related and that he was his son. He believes that this was, in part, due to the way his father was raised. His father has at least one other child, Gregory, who is older than Mr. Sykes. Gregory is hooked on heroin and has been in prison in Tennessee. Mr. Sykes has not seen him since he went to prison at age 19. Per Mr. Sykes, his father passed away in 2018 from an overdose of fentanyl and heroin. It should be noted that he told the presentence investigator that his father died from a heart attack.

Regarding his mother, Mr. Sykes states that Leslie Sykes "tried to do her best by us". She had an "indiscretion" when he was about 10. He elaborated by saying that she met Frederick Williams, who was a teacher in the Detroit Public School District. They eloped, and Mr. Williams moved in with the family. Mr. Sykes described Mr. Williams as an alcoholic who was abusive to him, his brother, and Ms. Sykes. He states that on one occasion, he saw Mr. Williams chase after his mother and drag her down a flight of stairs. The abuse was severe enough that his mother was hospitalized on several

This document is a confidential report of the Center for Assessment, Inc. It is protected by applicable state and federal laws. Unless permission is obtained from the client, it may not be duplicated or copied, shown, read or given to anyone, including but not limited to the parents, guardians, or individuals to whom it pertains. If you receive this document in error, please notify the Center for Assessment, Inc. at the number above immediately.

- 3 -

occasions due to her injuries. Mr. Williams would paddle Mr. Sykes with a wooden fraternity paddle. He does not believe that police or Children's Protective Services were ever involved due to the abuse. He indicates that he did not want people to know what was happening because he was afraid that he would end up in the foster care system. He states that he would run away from home and try to get relatives to take him in. He lived with his maternal grandmother for a time and she reportedly told him that she wanted to take his mother to court and get custody of him. He states that although there were some court proceedings, this did not work out.

Ms. Sykes eventually divorced Mr. Williams and tried to get Mr. Sykes to move back in with her. He states that by then he did not trust her and was already living on the streets. He denied gang involvement, stating that at the time he was growing up, gangs were not as prevalent in the area. He denied that his mother ever struggled with addiction. The marriage to Mr. Williams is her only marriage, and Mr. Sykes and Ronald are her only children. Mr. Sykes states that his brother Ronald has never been in legal trouble and is an upstanding citizen and father.

Per Mr. Sykes, he lived with his mother when he was released from prison in 2019. She gave him money and a van when he was released, but he lost it all gambling and began to avoid his mother as a result. Mr. Sykes states that he and his mother are presently in the process of trying to repair their relationship.

Mr. Sykes has no children. He married Elizabeth Sykes (*nee* Winchester) on September 29, 2025, while incarcerated. He states that he was dating her in the community. She has one child, a 10-year-old son, who resides with her. Per Mr. Sykes, he filed for divorce on February 3, 2026. He indicates that he has done so because the Federal Prison System has refused to acknowledge the marriage, although Ms. Sykes went on the internet and found a legal way for them to get married. He states he has not been allowed to put her on his visiting list because she is not considered "immediate family". He also believes that she is romantically involved with someone else. This is his only marriage.

### Educational/Vocational History
Mr. Sykes denied that he had difficulty in school, stating he was just absent a great deal. He denied ever being diagnosed with a learning disability or emotional impairment. He was never the recipient of special education services. Per documentation, Mr. Sykes had significant behavioral issues in school, including bringing a toy gun to junior high school, stealing a cell phone and jacket, truancy, insubordination and verbal abuse toward teachers. He was expelled from Osborn High School in Detroit in the 9th grade due to excessive absences and inappropriate behavior. He briefly attended Kettering High School but was suspended due to truancy and inappropriate behavior. Mr. Sykes graduated from Keweenaw Academy in Mohawk, Michigan in 2000 while he was involved in the juvenile justice system.

Upon release from a juvenile justice placement, Mr. Sykes enrolled at Metro Detroit Barber College and lived with his mother. He did not complete the program.

This document is a confidential report of the Center for Assessment, Inc. It is protected by applicable state and federal laws. Unless permission is obtained from the client, it may not be duplicated or copied, shown, read or given to anyone, including but not limited to the parents, guardians, or individuals to whom it pertains. If you receive this document in error, please notify the Center for Assessment, Inc. at the number above immediately.

- 4 -

Mr. Sykes' employment history is limited, as he has been incarcerated for the majority of his adult life. He reports that prior to his arrest in the present matter, he had started training to work for the Detroit Department of Transportation D-DOT driving buses. He states that this is work that he can do despite his felony convictions. He completed the training but had not yet obtained a commercial driver's license (CDL).

In 2025, Mr. Sykes wrote a memoir, My Biggest Losses. In that book, he talks about his background and history particularly pertaining to gambling. He reports that he has published 12 other books as well and would like to continue his work as a writer.

### Substance Abuse/Addiction History
Mr. Sykes indicates that he has used both marijuana and alcohol in the past. He denied that he has ever been a regular substance abuser. Per documentation, Mr. Sykes may have struggled with the abuse of marijuana as a teenager and young adult. He also has some substance use related tickets from his first prison incarceration.

Mr. Sykes notes that he believes that he is a gambling addict. He reported numerous thoughts and behaviors that are consistent with that diagnosis, such as taking large and larger financial risks, engaging in criminal behavior to finance his gambling, and a preoccupation with thoughts of gambling. He believes that this addiction stems from his childhood when he spent time with his father. He feels like his addiction is a prison.

### Mental Health History
Mr. Sykes has an extensive history of exhibiting mental health symptoms and being treated for mental health issues. As a juvenile, he was hospitalized at Havenwyk Hospital when he was 13 years old. At the time of his first admission, he was diagnosed with dysthymia, oppositional defiant disorder and marijuana abuse. He was there for over a month. Upon release, he was referred to outpatient therapy. He was readmitted the same year due to being assaultive toward others and engaging in self-injurious behavior. He was diagnosed with depression and ADHD.

Mr. Sykes was prescribed antidepressant medication when at Keweenaw Academy. While involved in the juvenile justice system, he did receive some therapy services; however, due to the age of these records, they were not able to be obtained.

Mr. Sykes reports that as an adult, he has been diagnosed with bipolar disorder, borderline personality disorder, chronic depression, post traumatic stress disorder and conversion disorder. He has been sent to a hospital outside of the BOP for assessment and treatment on at least one occasion. He states that he has talked to a therapist during his incarceration, but this has never been on a regular basis. He has been placed on suicide precaution on multiple occasions throughout his incarceration, noting that he sometimes feels helpless and hopeless. He indicates that he has been previously evaluated while in the BOP; however, does not feel as though he has been adequately assessed or diagnosed.

Mr. Sykes underwent a competency examination in 2019. It was determined that he was competent to assist in his own defense. Mr. Sykes is reported to have a history of acting out within the prison system for secondary gain He was diagnosed with antisocial

This document is a confidential report of the Center for Assessment, Inc. It is protected by applicable state and federal laws. Unless permission is obtained from the client, it may not be duplicated or copied, shown, read or given to anyone, including but not limited to the parents, guardians, or individuals to whom it pertains. If you receive this document in error, please notify the Center for Assessment, Inc. at the number above immediately.

- 5 -

personality disorder and the evaluator opined that Mr. Sykes does not have another form of mental illness.

Mr. Sykes reports that he has been prescribed numerous mental health medications during his incarcerations, including Prozac, Tofranil and Remeron. At the time of this assessment, he was not prescribed any psychotropic medications. He does think that medication has been beneficial in the past and would like to talk with a psychiatrist about the possibility of being placed on medication.

Mr. Sykes reports that he generally gets along well with others, but he prefers his own company. He denies any history of hallucinations or delusions. He denies paranoid thinking.

<u>Community Support</u>
Mr. Sykes reports that he belongs to the Sunni Muslim faith. He has been practicing since 2005. He does not have a mosque in the community. He reports that his mother is his primary means of social support.

<u>Trauma History</u>
Mr. Sykes reports that the abuse he sustained at the hands of his stepfather was traumatic to him, as was watching his mother being abused. When Mr. Sykes was 14 years old, he was shot. He states that he was walking home from school and was shot by someone he went to school with. He states that the bullet passed through his left bicep. He was treated at the hospital for his injury, and reports no long-term consequences. Mr. Sykes reports a history of cutting and self-injurious behavior. Mr. Sykes has a scar on his forehead, which he reports is from a childhood head injury. He did not lose consciousness and does not believe he was ever diagnosed with a concussion. He denied being victimized in the prison setting.

<u>Juvenile Justice Involvement</u>
He stated he became involved due to school truancy and home incorrigibility. Per documentation, he was having significant difficulty in his home and with his mother and was displaying assaultive and argumentative behavior and truancy. When Mr. Sykes was 17 years old, he was caught with crack cocaine. He was charged with possession with intent to sell. He was sentenced to probation. He states that he was made an Act 150 ward of the state at age 14, and was placed in a juvenile boot camp detention facility. An Act 150 commitment is generally reserved for serious, long-term delinquency cases for youth who require rehabilitation or specialized residential placement.

Upon release from the juvenile justice system, Mr. Sykes remained on probation until he was 19 years old. His juvenile involvement was terminated in August 2001. He lived with his mother. Per Mr. Sykes, "Then the casino happened". He states that the temporary casinos had been built in Detroit by the time he was released. He began dealing drugs to support his gambling habit and eventually ran away from his mothers' home. He states that he liked Motor City Casino the best and began going more and more frequently. He states that he would get excited even thinking about gambling, and still "gets the zing" when he thinks about gambling. He feels that from the time he began

This document is a confidential report of the Center for Assessment, Inc. It is protected by applicable state and federal laws. Unless permission is obtained from the client, it may not be duplicated or copied, shown, read or given to anyone, including but not limited to the parents, guardians, or individuals to whom it pertains. If you receive this document in error, please notify the Center for Assessment, Inc. at the number above immediately.

- 6 -

spending time with his father his entire life has been about gambling. He states that he had a fantasy that a big casino win could change his entire life.

*Adult Criminal History*
When asked about his criminal history, Mr. Sykes version of events was somewhat confusing and did not appear to include all documented offense. He believed his first offense was receiving and concealing stolen property. He stated that a "guy I was messing with" bought a vehicle with counterfeit money. As a result of this offense, Mr. Sykes served 5 months in the county jail in Adrain, Michigan.

On December 14, 2002, Mr. Sykes was involved in a bank robbery. He states that he was with his uncle and a friend. They went to a fifth third bank, and his co-defendant had a gun. When they entered the bank, Mr. Sykes went into the vault. His uncle was the getaway driver. Per Mr. Sykes, his uncle also had a gambling problem. He was identified as one of the perpetrators of the robbery and sentenced to 17 years in federal prison.

Upon release, Mr. Sykes was in the community for 45 days. He states that he began gambling, and robbed two banks, the Citizens Bank in Warren and the Comerica Bank in Oak Park. After robbing the first bank, he went to the casino and lost the money. He robbed the second bank the same day. He went back to the casino and won some money. He states that he "called it a day" and left the casino. He was identified through facial recognition and was arrested while playing craps at the casino. He denied that he was armed during either robbery.

As a result of these offenses, Mr. Sykes served 68 months in a prison in Florida. While incarcerated, he got into trouble for having a cell phone and was charged for this offense. After being released, Mr. Sykes was in the community for 13 months. He then robbed four banks, resulting in his current charges. Regarding the fact that he was driving a Rolls-Royce at the time of at least one of the robberies, Mr. Sykes states that this was about gambling. He states that he rented it because he thought it would help to change his luck at the casino.

Per the Presentence investigation report, Mr. Sykes was convicted of Possession of a Controlled Substance (Narcotics or Cocaine)-Attempt in 2001. He was sentenced to six months in boot camp and two years' probation. This sentence was amended to two years' probation with six months in the Wayne County Jail.

On April 2, 2001, Mr. Sykes was arrested for Receiving and Concealing Stolen Property. After being arrested, he attempted to escape from custody, and a charge of Resisting or Obstructing a Police officer was added. He was sentenced to 6 months in the Wayne County Jail and 2 years' probation. On August 21, 2001, his probation was amended. On October 5, 2001, a warrant was issued due to a violation of probation. On October 11, 2001, Mr. Sykes was charged with Unlawful Use of a Motor Vehicle and Failure to Appear. He was sentenced to 6 months in custody, 5 years' probation and 30 days in custody for the failure to appear offense.

This document is a confidential report of the Center for Assessment, Inc. It is protected by applicable state and federal laws. Unless permission is obtained from the client, it may not be duplicated or copied, shown, read or given to anyone, including but not limited to the parents, guardians, or individuals to whom it pertains. If you receive this document in error, please notify the Center for Assessment, Inc. at the number above immediately.

- 7 -

Per documentation, Mr. Sykes attempted to escape from the Wayne County Jail on January 8, 2003. He was subsequently classified as a maximum-security prisoner.

On July 20, 2004, Mr. Sykes was charged with perjury after reportedly lying under oath about his co-defendant by stating he never testified that his co-defendant was involved in the robbery. He was sentenced to 60 months in custody, with 30 months to run concurrently.

In 2005, Mr. Sykes was sentenced to 17 years in prison as a result of the above-mentioned bank robbery. He served 16.5 years of his 17-year sentence. He was released on July 1, 2019. On August 15, 2019, he was taken into custody for violating the conditions of his release by being involved in a bank robbery. He was sentenced to 68 months custody and three years' supervised release. On November 24, 2020, he was convicted of Possession of a Cell Phone in Jail and sentenced to 108 days in custody. He was released on February 2, 2024. On March 18, 2025, he was arrested for the instant offense.

Mr. Sykes told this writer that he that he had a lot of tickets in the beginning of his incarceration. Per documentation, Mr. Sykes had numerous tickets that resulted in disciplinary hearings, including engaging in sexual acts, substance related tickets, possessing unauthorized items, threatening bodily harm and disruptive conduct.

## Instant Offense
Per documentation, on March 6, 0225, Mr. Sykes he entered the Credit Union One in Sterling Heights, Michigan. He gave the teller a note that said he could not read and then announced that this was a robbery. The teller gave him $10,169. He took the money and fled.

On March 10, 2025, Mr. Sykes entered the Michigan Educational Credit Union in Livonia. He gave a note to the teller that demanded that the teller give him money and included a threat. The teller gave him $9,100.

On March 12, 2025, Mr. Sykes entered the Chase Bank in Lathrop Village and gave the teller a note that said, "Give me all the money...I have a gun...I will kill everyone in here". The teller gave him approximately $3,400. On this same date, Mr. Sykes attempted to rob the Huntington Bank in Redford Township. He went to the counter and held up a note that said this was a robbery. Before the teller could finish reading the note, Mr. Sykes walked out of the bank without any money.

Law enforcement recovered fingerprints from the entry door of Credit Union One that matched Mr. Sykes. Additionally, in October of 2024, Mr. Sykes received a traffic ticket while driving a black Mercedes sedan, which was a car identified at one of the robberies. Law Enforcement learned that Mr. Sykes was on federal supervised release from the 2020 robbery. His probation officer confirmed that he drove a black Mercedes Sedan. Law Enforcement located Mr. Sykes at the MGM Casino in Detroit. On March 18, 2025, Mr. Sykes was arrested in Detroit.

This document is a confidential report of the Center for Assessment, Inc. It is protected by applicable state and federal laws. Unless permission is obtained from the client, it may not be duplicated or copied, shown, read or given to anyone, including but not limited to the parents, guardians, or individuals to whom it pertains. If you receive this document in error, please notify the Center for Assessment, Inc. at the number above immediately.

- 8 -

Mr. Sykes reported that the sentencing guidelines in this matter are 151 to 188 months. He states that he knows that he needs help for his gambling addiction, and attributes his behavior to this addiction. He noted that in the past he has struggled behaviorally while in custody, but has not had any tickets during his present detention.

## BEHAVIORAL OBSERVATIONS AND TEST RESULTS FOR MR. SYKES

Mr. Sykes was evaluated at the Milan Federal Detention Center. The first time this writer attempted to assess him, she was informed that Mr. Sykes was claiming to be paralyzed and could not, therefore, participate in the evaluation. This writer met with Mr. Sykes in an attorney room at the detention center. He was dressed in the standard issue detention uniform. His grooming and hygiene appeared to be adequate. There were no unusual behaviors or verbalizations noted. Mr. Sykes was polite and appeared to be making an effort to answer all questions presented to him. He denied the presence of homicidal or suicidal thoughts. His affect was appropriate to verbal content. There were no apparent signs of hallucinations, delusions, bizarre behaviors or other indicators of psychotic process. Associations are intact, thinking is logical, and thought content appears appropriate. Cognitive functioning and fund of knowledge is intact and age appropriate. Short and long-term memory is intact, as is ability to abstract. He was alert and globally oriented. His intellectual functioning is estimated to fall in the average range. Mr. Sykes's behavior was cooperative and attentive with no gross behavioral abnormalities. It is believed the results provide an accurate estimate of Mr. Sykes's current emotional and psychological functioning.

Mr. Sykes completed the Minnesota Multiphasic Personality Inventory-3- (MMPI-3). The MMPI-3 aids in the assessment of mental disorders, the identification of specific behavioral or emotional issues and treatment planning in a variety of settings. The test can be used to help assess major symptoms of psychopathology, personality characteristics and behavioral proclivities, evaluate participants in substance abuse programs and select appropriate treatment approaches, provide valuable insight for marriage and family counseling, support classification, treatment and management decisions in criminal justice and correctional settings, identify high-risk candidates in public safety screening and give strong empirical foundation for expert testimony in forensic evaluations. Mr. Sykes's responses on the MMPI-3 suggest he responded in an inconsistent manner. This can occur when the test taker has reading or language limitations, cognitive impairment, responds in a careless manner or has an uncooperative test taking approach. Although there is no evidence that Mr. Sykes responded in this manner in a purposeful attempt to invalidate the inventory, results must be interpreted with caution. Based on his responses, Mr. Sykes endorsed items suggesting he has a lack of positive emotional experiences. He is socially introverted and disengaged. He is likely to feel pessimistic about the future and displays the more vegetative symptoms of depression. His responses suggest a history of suicidal ideation ot gesture. Mr. Sykes is at risk for self-harm and is preoccupied with suicide and/or death. Mr. Sykes' responses also suggest that he has a history of engaging in compulsive behaviors such as repetitive checking. He is likely to experience obsessive thinking. Mr. Sykes is likely to be impulsive, and to have a history of problematic impulsive behavior. He does not enjoy social situations or events, and prefers to be alone.

This document is a confidential report of the Center for Assessment, Inc. It is protected by applicable state and federal laws. Unless permission is obtained from the client, it may not be duplicated or copied, shown, read or given to anyone, including but not limited to the parents, guardians, or individuals to whom it pertains. If you receive this document in error, please notify the Center for Assessment, Inc. at the number above immediately.

- 9 -

Mr. Sykes completed the Millon Clinical Multiaxial Inventory-IV (MCMI-IV). The MCMI-IV provides helpful clinical insights into a patient's personality that allow clinicians to make reliable diagnostic and treatment decisions. The MCMI-IV identifies potential personality issues in three ways. The first, personality style, reflects personality traits that may occasionally interfere with important life functions. The second, personality type, reflects personality traits that are likely to cause more significant disruptions in interpersonal functioning. The last, a personality disorder, occurs when the test taker responds in a manner similar to those who have been formally diagnosed with a personality disorder. The MCMI-IV offers updated norms that are based on a clinical adult population, DSM-V alignment and therapeutic focus. The MCMI-IV is supported by over 35 years of clinical research. Mr. Sykes's responses suggest he responded in a valid and consistent manner, with a slight tendency to overreport symptoms. This is not uncommon for individuals involved in the court system, and is often done as a "cry for help". Based on his responses, Mr. Sykes is struggling with a significant amount of anxiety. He is likely to experience a generalized state of tension, along with an inability to relax. He is hypervigilant in his environment, ready to react at even the most minor signs of potential danger. He is likely to experience physical symptoms of anxiety, such as muscle aches and excessive sweating. There were no elevations on any of the clinically significant scales on this inventory, suggesting Mr. Sykes does not struggle with a mental health issue that would interfere with his ability to function effectively within his environment.

The DSM-5-TR definition of gambling disorder describes the condition as a persistent and problematic gambling behavior pattern leading to significant distress or impairment. To receive a diagnosis of gambling disorder, an individual must meet at least four of these criteria within a 12-month period:

- **Preoccupation with gambling:** Mr. Sykes verbally describes a preoccupation with gambling.

- **Need to gamble with increasing amounts of money:** Mr. Sykes meets this criterion, as evidenced by his description of needing to place larger and larger bets.

- **Unsuccessful attempts to stop or control gambling:** Mr. Sykes was unable to stop gambling even while involved in the court system and while expressly prohibited from entering the casino.

- **Restlessness or irritability when attempting to stop gambling:** Mr. Sykes meets this criterion, reporting that if he was not able to go to the casino or did not have money to gamble, he would become upset and irritable.

- **Gambling as an escape from problems or negative mood:** Mr. Sykes reports feeling better about himself while gambling.

- **Chasing losses:** Mr. Sykes reports that part of the motivation to rob banks was so that he could return to the casino and recoup his losses.

This document is a confidential report of the Center for Assessment, Inc. It is protected by applicable state and federal laws. Unless permission is obtained from the client, it may not be duplicated or copied, shown, read or given to anyone, including but not limited to the parents, guardians, or individuals to whom it pertains. If you receive this document in error, please notify the Center for Assessment, Inc. at the number above immediately.

- 10 -

- **Lying to conceal the extent of gambling involvement:** Although Mr. Sykes did not expressly describe lying about his gambling, he did report attempts to avoid his mother due to his gambling.

- **Jeopardizing or losing important opportunities:** Mr. Sykes violated the terms of his probation and lost his opportunity to live in the community as a result of his inability to cease gambling.

- **Relying on others for financial bailouts:** Mr. Sykes reported selling the car his mother bought him upon his release from incarceration, as well as spending the money that she gave him in order to continue gambling.

- **Has committed illegal acts:** Mr. Sykes reports that his bank robbing activities were designed to finance his gambling.

## CONCLUSIONS AND RECOMMENDATIONS

Dorian Sykes was referred for evaluation and risk assessment secondary being charged with 2 counts of Credit Union Robbery, one count of Bank Robbery and one count of Attempted Bank Robbery in the United States District Court for the Eastern District of Michigan.

Dorian Sykes is a 42-year-old man presently housed at the Milan Federal Detention Center. Mr. Sykes was born in Michigan to unwed parents. His father was in prison at the time of his birth and played a limited role in his upbringing. When his father was involved, Mr. Sykes was taken to various after hour clubs and taught to gamble along with other illegal and conning behaviors. In addition, his father was a lifelong substance abuser. Mr. Sykes' mother married an individual who was abusive to her as well as to Mr. Sykes. He reports that he left the home to avoid this relationship and has been fending for himself ever since.

Mr. Skyes graduated from high school while in a juvenile justice placement. He reportedly had a great deal of behavioral difficulty in school in the community and was frequently truant. After graduating from high school, Mr. Sykes attended barber college, although heh did not complete the program. He has a limited amount of work experience in the community, reporting he was training to become a bus driver at the time of his arrest in the present matter.

Mr. Sykes has a long history of law-breaking behavior starting as a juvenile. He has had limited success in the community while on supervised release. Even during his incarceration, he continued to earn tickets and was convicted of possession of a cell phone in jail in 2020. That being said, although he had some treatment as a juvenile, he has had limited treatment opportunities or success as an adult.

Mr. Sykes has been assessed on multiple occasions both as a juvenile and an adult. He spent time in a psychiatric hospital as a juvenile. He has been assessed for competency as an adult, along with other assessments within the BOP. One evaluator opined that Mr. Sykes does not have a mental health diagnosis, while other evaluators and

This document is a confidential report of the Center for Assessment, Inc. It is protected by applicable state and federal laws. Unless permission is obtained from the client, it may not be duplicated or copied, shown, read or given to anyone, including but not limited to the parents, guardians, or individuals to whom it pertains. If you receive this document in error, please notify the Center for Assessment, Inc. at the number above immediately.

- 11 -

treatment providers have diagnosed him with multiple mental health conditions. He has been prescribed psychotropic medications in the past, although was not taking medications at the time of this assessment.

Personality inventories suggest Mr. Sykes does struggle with impulsivity and severe anxiety. Although he does not meet the criteria for a significant mental health disorder, Mr. Sykes does have symptoms consistent with trauma exposure, likely stemming from his history of childhood abuse, being shot, and incidents that occurred while he was in prison, including spending long periods of time isolated while in "the hole".

Mr. Sykes meets the DSM-5-TR definition of gambling disorder, severe. The most successful treatment for gambling disorder includes a combination of cognitive behavioral therapy (CBT), support groups such as Gamblers Anonymous (GA) and medication to treat underlying mental health disorders (such as impulse control disorder). It should be noted that individual CBT is not easily or widely available in the prison system. Although there are a few federal prisons that offer GA, this is not a generally offered program. It will be difficult for Mr. Sykes to adequately address his addiction issues within the BOP.

Mr. Sykes does not deny the offense(s) for which he is presently before the court. He admits to taking the money from the robberies and using it to further his gambling addiction. He reports that he recognizes that his gambling is out of control, and expresses a desire to get help so that he does not continue to allow this addiction to inform his decisions.

Based on the above, the following recommendations are made:

1. Consideration should be given to placing Mr. Sykes in a BOP facility that offers a Gamblers Anonymous program.

2. Upon release, Mr. Sykes should engage in individual cognitive behavioral therapy geared toward the reduction of compulsive gambling behavior and also to address childhood trauma.

3. Upon release, Mr. Sykes should be evaluated by a psychiatrist to determine if an opioid antagonist medication such as Naltrexone might aid him in reducing the urge to gamble.

4. Mr. Sykes has limited job skills, and as such will have a difficult time supporting himself in the community. Learning a skill or trade will be crucial for him to successfully transition back into the community.

5. Upon release, Mr. Sykes should be placed on the banned list for all Michigan casinos. He should also be placed on an electronic monitoring device designed to alert if he enters any such establishment.

6. Upon release, Mr. Sykes' phone should be regularly monitored to ensure he is not engaging in online gambling.

This document is a confidential report of the Center for Assessment, Inc. It is protected by applicable state and federal laws. Unless permission is obtained from the client, it may not be duplicated or copied, shown, read or given to anyone, including but not limited to the parents, guardians, or individuals to whom it pertains. If you receive this document in error, please notify the Center for Assessment, Inc. at the number above immediately.

- 12 -

Respectfully Submitted,

Jennifer M. Zoltowski, MS, LLP

This document is a confidential report of the Center for Assessment, Inc. It is protected by applicable state and federal laws. Unless permission is obtained from the client, it may not be duplicated or copied, shown, read or given to anyone, including but not limited to the parents, guardians, or individuals to whom it pertains. If you receive this document in error, please notify the Center for Assessment, Inc. at the number above immediately.

Exhibit 2

# Felon charged with robbing two banks in Warren, asks police if he can keep money he won at casino

Published  August 14, 2019 4:31pm EDT  |  **News**  .  FOX 2 Detroit  ⁞

**WARREN, Mich. (FOX 2)** - Warren Police said one man was arrested earlier th week for bank robberies in Warren and Oak Park. When arrested, the police ch said he asked if he could keep the money that he had won from gambling at th casino.

The two bank robberies both happened Tuesday, one at Citizen's Bank on Van Dyke in Warren and the other at Comerica near 10 Mile and Coolidge.

According to police, the Warren robbery happened just after 9:15 Friday. The suspect walked in, asked about opening an account and then produced a note saying it was a robbery. The clerk handed over the money and the then left.

It was determined the teller's drawer was short $1,222.

The suspect was described as a black man, 25-35 years old, 5'10" - 6'01" tall, 1€ 170 pounds, wearing a black sweatsuit with white stripes. They also said he drc off in a silver Cadillac DTS.

A few hours later, around 3:15 p.m., Oak Park reported the bank robbery at Comerica. The suspect entered the bank, said he wanted to open an account, gave a note saying it was a robbery, and then left in a silver Cadillac DTS.

Through the investigation, Warren police identified the suspect in both robberi as Dorian Sykes, 35. Investigators said his car is the same as described in the crimes and has prior federal convictions for bank robbery and gun crimes. The said Sykes served almost 15 years in federal prison.

Sykes was eventually found at Motor City Casino the next day. According to pol chief Bill Dwyer, he gambled the money he took in the robbery and even asked police if he could keep the money he had won from gambling that money.

During the interview with Warren detectives and the FBI, officials said he confessed to the robberies.

The FBI will handle prosecution of the crimes as Sykes has prior convictions in t federal system and is currently on federal parole.

Sykes was convicted in 2002 of robbing a Warren bank and a Detroit bank whe he and his partner robbed the bank of more than $200,000.

This material may not be published, broadcast, rewritten, or redistributed. ©2026 FOX Television Stations